INDEPENDENT TRADING COMPANY, INC., Respondent, *v.* E. FOUGERA & CO., INC., Appellant.

First Department, July 2, 1920.

**Sales — action to recover for breach of contract for sale and delivery of goods of certain quality — defense of mutual mistake as to identity of goods — when defendant not entitled to reformation of contract — mistake not mutual — failure to show fraud of buyer — when reformation of contract necessary to defeat legal action thereon.**

In an action to recover damages for breach of a written contract for the sale of a certain chemical at a stated price, the defendant claimed that it did not intend to sell and deliver a chemical of the grade or quality named in the contract so that there was a mutual mistake respecting the identity of the article in suit.   Evidence examined, and *held*, that no mistake as to the identity of the chemical to be delivered was made by either party, and as the defendant withdrew at trial all claims of fraud on the part of the plaintiff, it was entitled to recover for the defendant's breach.

The defendant, having made the contract in question which used terms well understood in the trade, should be held to a strict performance thereof.

Even if the defendant made a mistake, it is not entitled to a reformation of the contract as respects the identity of the article to be delivered in the absence of proof of fraud on the part of the plaintiff or that the mistake was mutual.

A defendant cannot admit the execution and validity of a written contract and without reforming it escape liability for damages in an action at law on the pretext that the written contract does not express the actual agreement of the parties.

GREENBAUM and SMITH, JJ., dissent, with opinion.

APPEAL by the defendant, E. Fougera & Co., Inc., from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 27th day of June, 1919, upon the decision of the court rendered after a trial by the court at Trial Term, a jury having been waived.

*Walter L. Post* of counsel [*Charles M. Russell*, attorney], for the appellant.

*Louis S. Posner*, for the respondent.

MERRELL, J.:

This action is brought to recover damages for the alleged breach of written contracts for the sale of 150 pounds of potassium guaiacol sulphonate.

The complaint alleges that on or about July 18, 1917, the plaintiff purchased of the defendant 100 pounds of the chemical above mentioned, and on the nineteenth of July, an additional 50 pounds. The purchase price was ten dollars and fifty cents per pound.

The defendant admits having made written contracts for the delivery of 150 pounds of potassium guaiacol sulphonate at the price aforesaid, but set up as a defense that it never understood that it was agreeing to deliver to the plaintiff the quality of potassium guaiacol sulphonate called for in the contract and which plaintiff claims the defendant agreed to deliver. The answer asserts that the word " white " was fraudulently inserted in the order by the plaintiff, and defendant asked for a reformation of the contract by striking out that word. Upon the trial it was stipulated that there was no fraud on the part of the plaintiff, but that the sole question presented was of a mutual mistake respecting the identity of the article in suit. Upon this proposition it is claimed by the defendant, appellant, that there were two grades of potassium guaiacol sulphonate recognized by the trade. One of these grades is claimed to be in powder form known as calcine, the other being a crystalline form of perfectly white

crystals. The calcine form was, at the time of the sale, of the value of about ten dollars a pound and the crystalline form, as testified to by defendant's president, was of the value of about thirty dollars per pound. It was stipulated at the opening of the trial that the market price of the crystalline form, at the time in question, was thirty dollars per pound. The written orders upon which the action is based are respectively dated July 18, 1917, and July 19, 1917. The first calls for 100 pounds of " potassium guaiacol sulphonate. C. P. White." The second agreement calls for 50 pounds of the same article. The price, as aforesaid, was ten dollars and fifty cents per pound. It is admitted that the letters, " C. P.," mean " Chemically Pure."

Plaintiff's president testified that there was but one standard article known as potassium guaiacol sulphonate upon the market, and that after the war began it was customary to designate the quality by the insertion of the word " white " in case the purchaser wished the perfectly fresh article; that potassium guaiacol sulphonate would turn slightly pink from age, and as much of the article upon the market at the time of the purchase in question was old stock, that the word " white " was inserted in the contract because the purchaser wished to obtain under these orders a perfectly fresh article.

Upon the part of the defendant it is claimed that another article was upon the market and had been for upwards of twenty-five years, known as thiocol, which contained the same chemical ingredients as potassium guaiacol sulphonate. Thiocol, however, was a trade name which had been adopted by the Hoffman-LaRoche Chemical Company, manufacturers. All of the experts, including an expert sworn by the defendant, testified that thiocol as put out by the Hoffman-LaRoche Company contained absolutely the same ingredients as the standard article known as potassium guaiacol sulphonate. It was understood in the trade that when thiocol was called for it meant the article as manufactured by the Hoffman-LaRoche Company.

On the part of the appellant it is claimed that when the term thiocol is used in an order it means crystalline potassium guaiacol sulphonate, which would be perfectly white in color. The contracts sued upon were made by the defendant, appellant, through an employee by the name of Jacobs. On July 18,

1917, the plaintiff called the defendant company on the telephone and Jacobs responded. What took place is testified to by one Morgenstern, the president of the plaintiff, and by Jacobs, the aforesaid employee of the defendant. Morgenstern says that on July 18, 1917, he called the defendant's office and asked for a quotation on 100 pounds of potassium guaiacol sulphonate, c. p. white. Jacobs asked for about ten minutes time and said that he would call back. This he did and told Morgenstern that the price was ten dollars and fifty cents per pound, and that plaintiff's president said to Jacobs that he would take 100 pounds, and that Jacobs said, " Send around your contracts." The plaintiff immediately sent over the contract sued upon in duplicate, both copies bearing Morgenstern's signature, as president of plaintiff, and Jacobs admitted that he read the same and saw therein the terms, " c. p. white." The contract was at once returned by the defendant to plaintiff, with the acceptance of the defendant thereon in writing, as follows: " Accepted, E. Fougera & Co., W. L. Jacobs." Practically the same negotiations were had on the following day when the additional fifty pounds were ordered and agreed to be sold, Jacobs again asking for time before quoting price. Jacobs testified that while he read the contract and saw the words, " c. p. white," still he was of the opinion that the article called for by the contract was the calcine or powder form of potassium guaiacol sulphonate, which this witness says was then being sold as the commercial product. Jacobs testified that immediately upon receiving the telephone call from Morgenstern, in each instance he called up a concern known as the Lister Chemical Company, which claims to have been the only American manufacturer of the article at that time. He testified that the Lister Chemical Company told him that the defendant could have the article manufactured by it at ten dollars per pound. Jacobs then called up Morgenstern and told Morgenstern that the plaintiff could have 100 pounds at ten dollars and fifty cents a pound. It is admitted that the article sold by the Lister Chemical Company, a sample of which was sent to the plaintiff, was not potassium guaiacol sulphonate in the crystalline form. The day after making the last contract

the defendant sent a sample of the article manufactured by the Lister Chemical Company to the plaintiff with a letter stating that the article inclosed was a sample of the chemical which the defendant was going to deliver under the contracts of July eighteenth and nineteenth. No reason appears for sending the sample, as the sale was not by sample. Plaintiff immediately wrote the defendant, returning, at least, a part of the sample, and also a sample of the article which the plaintiff thought it had purchased, and stating that the plaintiff would not accept the chemical, a sample of which the defendant had sent to the plaintiff, and that the sample did not conform at all to the article called for in the two agreements. One Edgar Gilbert, the general manager of the Lister Chemical Company, was sworn as a witness by the defendant, and he testified that the Lister Company manufactured both the calcine and crystalline forms of potassium guaiacol sulphonate; that the calcine or powder form was manufactured more cheaply than the other, but that both forms contained exactly the same chemicals and in the same proportions, the difference being that the cystalline form contained a greater percentage of water which was absorbed in the process of crystallization. The calcine form manufactured by the Lister Company, a sample of which was delivered to the plaintiff as aforesaid, had a *brownish* color, and it is claimed by the plaintiff and the experts sworn by it that the color of the sample being dark showed conclusively that the article was not chemically pure as ordinarily understood in the trade. It is apparent from the language of the two orders that the plaintiff understood that it was buying chemically pure *white* potassium guaiacol sulphonate, which is also exactly the same commodity sold under the name of thiocol. Plaintiff's president testified that the plaintiff had upon several occasions purchased powdered potassium guaiacol sulphonate which was chemically pure white. His theory of the powdered article was that the crystalline form had been reduced to powder. It would appear from his testimony that had the defendant delivered chemically pure white potassium guaiacol sulphonate in the powdered form it would have been acceptable. It, therefore, follows that the sole contention made by the plaintiff is that the article which the defendant sought to deliver was not

chemically pure white. The distinction, therefore, made by the defendant between the calcine and crystalline forms is not material, for the reason that the article which the defendant actually sought to deliver is admittedly not the chemically pure white article.

The learned trial court found for the plaintiff on all of these contentions and held that there was no mutual mistake between the parties.

Upon the question of the credibility of witnesses and whether or not the defendant was acting in good faith, it appears that while the defendant seems to be a company doing a large general business, still it was admitted by Jacobs that the company had never sold over fifty or sixty pounds of the powdered article manufactured by the Lister Chemical Company. This witness also admitted that since the purchase made by the plaintiff, the defendant had been delivering potassium guaiacol sulphonate chemically pure white and of the crystalline type *under orders exactly similar to the ones sued upon,* and that the defendant was not dealing at the time of the trial in the product of the Lister Chemical Company at all, but was importing its chemicals. It is apparent, therefore, from the testimony of the defendant's chief witness, Jacobs, that potassium guaiacol sulphonate, c. p. white, was generally recognized by the trade as being the article which the plaintiff claims to have purchased under the descriptions contained in the two contracts. While Jacobs tried to make it appear that the understanding of the defendant was that it had sold the cheaper article and that it was customary to use the term " thiocol " or the term " crystal white " in describing the crystalline form, still his contention in this respect is weakened by his later testimony where he admits that the defendant is now selling the crystalline form under orders similar to those given by the plaintiff. The only circumstance which is at all in favor of the defendant is that the plaintiff admitted that the article which it thought it was purchasing was worth thirty dollars a pound on the day the bargains were made, whereas the purchase price mentioned in the contracts was ten dollars and fifty cents per pound.

After a careful reading of the evidence I am of the opinion that no mistake was made by either party; that the plaintiff

called upon a large concern to sell an article well recognized by the trade and was quoted the price mentioned in the contract, and, realizing, that the bargain was a good one, made quite a considerable purchase. On the part of the defendant, I am of the opinion that it was endeavoring to sell to druggists under the aforesaid term an inferior product, and that the defendant deliberately intended to deliver to the plaintiff under those contracts an article which the defendant knew to be inferior. The defendant, having made the contract in question which used the terms well understood in the trade, should be held to a strict performance thereof.

If the defendant had persisted in its claim that the plaintiff had perpetrated a fraud upon the defendant, and that the word " white " was fraudulently inserted in the orders, or had the defendant pursued its demand that the contracts be reformed by striking therefrom the word " white," as originally asked in defendant's answer, there would have been some ground upon which a court of equity might have afforded the defendant relief. But at the commencement of the trial it was expressly stipulated that the answer be amended by striking therefrom the allegations of fraud on plaintiff's part and for a reformation of the contracts. And it was then expressly stipulated: " that the question before the court is one of mutual mistake as to the identity of the article in suit."

Even though the evidence supported defendant's claim that it did not understand the effect of the contracts which it made, and did not know that it thereby agreed to sell and deliver the crystalline form of the commodity, there was no mistake on the part of the plaintiff. It knew what it wanted and what it bargained for, viz., potassium guaiacol sulphonate, chemically pure white. There was never any doubt on plaintiff's part as to what it was buying. The term, " mutual mistake," means a mistake on the part of both parties to the contract. Even if defendant made a mistake, which I think upon the evidence is a violent assumption, in the absence of proof of fraud or mutual mistake, the defendant cannot escape the consequences of its contract. In this case fraud was eliminated, and the evidence does not establish that there was any mutual mistake of the parties as to the identity

of the article covered by the contract. The facts in the case at bar do not bring it within *City of New York* v. *Dowd Lumber Co.* (140 App. Div. 358), upon which appellant relies. In the *Dowd Lumber Co.* case it was held that " ' if by reason of ambiguity in the terms of the contract, or some peculiar circumstances attending the transaction, it appears that one of the parties has, without gross fault or laches on his part, made a mistake, that this mistake was known, or ought to have been known, to the opposite party, and that the mistake can be relieved against without injustice,' " the party making the mistake may be relieved. In the case at bar there was no ambiguity in the terms of the contract, and there were no peculiar circumstances attending the transaction. Plaintiff's president told defendant what he wanted and asked for price quotation. After looking the matter up, defendant's representative quoted a price on the commodity which plaintiff wished to purchase, and the deal was closed. At the request of defendant's representative plaintiff's president prepared and submitted to defendant a proposed contract executed by plaintiff and describing the article sold. Defendant's representative admits that he read the contract and saw that it covered potassium guaiacol sulphonate, c. p. white, and, with full knowledge that the contract thus identified the article, executed the same in defendant's behalf, and the next day repeated the performance. Defendant cannot admit the execution and validity of these written contracts, and without reforming them, escape liability for damages in an action at law, on the pretext that the written contracts do not express the actual agreement between the parties.

As was said by LAUGHLIN, J., in *Ward* v. *Union Trust Co.* (166 App. Div. 762, 765) in discussing *City of New York* v. *Dowd Lumber Co.* (*supra*) and kindred cases: " None of those authorities, however, sustain the contention made in behalf of the respondent that a defendant may admit the execution and validity of a contract in writing and at the same time, without reforming it, show in defense to the action at law thereon, not that there was *no* agreement at all on a particular subject embraced in the contract, but that the agreement thereon negotiated by the parties was not as evidenced by the writing; and all of the authorities are, I think, to the contrary."

(*Born* v. *Schrenkeisen*, 110 N. Y. 55; *City of New York* v. *Matthews*, 156 App. Div. 490; affd., 213 N. Y. 563.)

The judgment appealed from should be affirmed, with costs.

CLARKE, P. J., and LAUGHLIN, J., concur; SMITH and GREENBAUM, JJ., dissent.

GREENBAUM, J. (dissenting).

It seems to me that the fact that plaintiff's president was thoroughly familiar with the market price of "potassium guaiacol sulphonate" and had on the same day and immediately prior to placing the order with the defendant received several quotations on that article, all of these at about thirty dollars a pound, shows that plaintiff knew or ought to have known that Jacobs, defendant's salesman, could not have intended to sell the crystalline form at ten dollars and fifty cents a pound. As to Jacobs his testimony was, that he was not sufficiently well informed, at the time the contract was entered into, of the difference in the nomenclature between the crystalline and the powdered form of the drug. He testified that he had previously sold the powdered form under the description "potassium guaiacol sulphonate," and that he knew the crystalline form as "thiocol." He also knew that the crystal form was worth thirty dollars a pound at that time and that the price of the powdered form was ten dollars. Although he subsequently delivered the crystalline variety under similar orders, this was after the mistake had been discovered.

This is not a case of mutual mistake. The situation presented is one of a mistake on one side which was known or should have been known to the other contracting party. As was stated in *City of New York* v. *Dowd Lumber Co.* (140 App. Div. 358): "'If * * * it appears that one of the parties has, without gross fault or laches on his part, made a mistake, that this mistake was known, * * * and that the mistake can be relieved against without injustice, the court will afford relief, either by refusing to decree specific performance, by cancellation, *or by refusing to give damages.* * * * Where the mistake is patent, where the opposite party knew or should have known of it, no contract has been made, the

minds of the parties have not met, and they will be left where the mistake places them.'"

*Ward* v. *Union Trust Co.* (166 App. Div. 762) is not in point. That was an action brought by the owners of a piece of property to recover the amount of taxes for the year 1914 paid by them, the plaintiffs relying upon a term of the lease which obligated defendant to pay all taxes. The defendant's answer admitted the execution of the lease and set up by way of counterclaim that by the negotiations between the parties preliminary to the execution of the lease it was agreed that the lessee was to pay the taxes only up to and including the year 1913; but that the lease was so drawn as to imperfectly describe the common intention of the parties. Under such circumstances the court properly held that the evidence in support of the counterclaim would not under the parol evidence rule be admissible. The *Ward* case, therefore, was not a case where the minds of the parties never met, but where the written lease did not express the actual agreement which they had made. Indeed, it was stated in that case that " in an action at law based on a contract in writing the defendant may show, to avoid liability, that the minds of the parties did not meet on the contract as pleaded, and that, therefore, the alleged contract was never made."

I cannot agree with the majority opinion which states that there is reason to suppose that defendant deliberately intended to deliver to plaintiff an article which defendant knew to be inferior, for the reason that plaintiff was a very large dealer in that article and it is not likely that such a fraud would be attempted, or, if attempted, would be successful. It may be assumed in view of the expert testimony that there was no ambiguity, but there were certainly " peculiar circumstances " attending the transaction.

The difference between the contract price and the market price of the article named in the contract is so strikingly great that there can be no doubt that the minds of the parties did not meet with respect to the article intended to be sold.

I think that the judgment should be reversed.

SMITH, J., concurs.

Judgment affirmed, with costs.